RADIO CORPORATION OF AMERICA et al.
v. CABLE RADIO TUBE CORPO-
RATION (two cases).
Nos. 406, 407.

Circuit Court of Appeals, Second Circuit.
Aug. 29, 1933.

Laughlin, Gerard, Bowers & Halpin, of New York City (John J. Halpin and Joseph W. Kirkpatrick, both of New York City, of counsel), for defendant-appellant.

Stephen H. Philbin, of New York City (Charles Neave, Stephen H. Philbin, and William J. Barnes, all of New York City, of counsel), for plaintiffs-appellees.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

These proceedings comprise two suits in equity which have been consolidated for appeal by order of this court of November 28, 1932. The District Court has entered substantially similar decrees and orders in each case, the parties are the same except that there is an additional party plaintiff in one of the cases, and since both cases raise precisely the same questions of law and fact, they will be treated and referred to as one.

In 1929, the defendant was manufacturing and selling certain types of radio tubes which the plaintiffs claimed were infringements of six patents held by them. Accordingly suit was instituted in the District Court seeking an injunction against continued infringement by the defendant, and an accounting for profits and damages resulting from past infringement. Subsequently a settlement was made between the parties pursuant to which a consent decree was entered on February 25, 1930. By the terms of this decree the patents on which the plaintiffs based their claims of infringement were adjudged to be valid, and the defendant was declared to have infringed them by manufacturing and selling vacuum tubes embodying the inventions. It was ordered that an injunction should issue perma-

nently restraining the defendant and its agents from further acts of infringement. The parties having made their own settlement with respect to profits and damages, no accounting was awarded. No writ of injunction was issued or served at the time the order was entered.

As of the same date that the decree ordering an injunction was entered, a written license agreement was adopted by the defendant, Radio Corporation of America, General Electric Company, and Westinghouse Electric & Manufacturing Company, the execution of which was assented to by the American Telephone & Telegraph Company. By virtue of this agreement, the licensors granted to the defendant, as nonexclusive licensee under the patents upon which the proceedings for an injunction were based, the right to manufacture and sell vacuum tubes embodying the inventions covered by the patents. In consideration of this grant the defendant agreed to pay to Radio Corporation of America a royalty of 7½ per cent. of the invoice price of all tubes manufactured and sold under the license; the total royalties for each year to amount at least to $50,000. The defendant agreed to render quarterly by the 15th day of January, April, July, and October of each year a report specifying the total number and invoice price of tubes sold during each month of the preceding quarter. The royalties were stated to be due and payable on the 30th day of January, April, July, and October for the period covered by the report previously rendered in the same month.

Section 2 of article 8 of the agreement provided that: "In the event of the failure by the Licensee at any time during the continuance in force of this Agreement to render any of the statements called for herein upon any of the prescribed dates, or to pay all of the royalties required hereunder when due, or to comply with any of the other obligations of this Agreement, for thirty (30) days after notification from the Radio Corporation by registered mail to the last known place of business of the Licensee, of any such default, this Agreement shall cease and terminate, at the option of the Radio Corporation, thirty (30) days after notice in writing by registered mail to that effect has been forwarded to the Licensee. The Radio Corporation shall also have the right to terminate this Agreement at any time upon the bankruptcy or insolvency of the Licensee or the appointment of a receiver for its property (not discharged within thirty (30) days after appointment), and upon the exercise of such right this Agreement shall terminate thirty (30) days after notice in writing by registered mail to that effect has been forwarded by the Radio Corporation to the Licensee. No cancellation shall release the Licensee from any of the liabilities accruing to the Licensors hereunder prior to the time such cancellation becomes effective. No failure on the part of the Radio Corporation to exercise its right of cancellation hereunder for any one or more defaults shall be construed to prejudice its right of cancellation for any subsequent default."

The license agreement further provided that it should continue in force until January 1, 1934, unless sooner terminated in the manner provided in the section just quoted. The licensee was likewise given an option to extend the agreement until January 1, 1939, if it should duly perform all of its obligations under the license and give written notice of the exercise of its option six months before January 1, 1934.

All royalties due under the agreement up to April 1, 1931, were paid, and reports for the last three-quarters of 1931 were rendered showing accrued royalties for that period amounting to $39,118.99. On February 9, 1932, the Radio Corporation sent the defendant a letter notifying the defendant of a default in payments due for the last three-quarters of 1931, and on March 11, 1932, the defendant was notified that the licensors had exercised their option to terminate the license for default in payment of royalties under section 2 of article 8 of the agreement.

The following day the Radio Corporation instituted an action in the New York Supreme Court for the recovery of royalties alleged to be due in the sum of $39,118.99. As a defense to this cause of action, and by way of counterclaim, the defendant in its amended answer to the complaint alleged that, contemporaneously with the execution of the license agreement, the parties thereto had entered into a parol agreement whereby the licensor, in consideration of the execution of the written agreement by the licensee, promised that it would furnish the licensee with reasonable advance notice of any change in the prices at which the plaintiff sold its tubes and of any new type of radio tube to be sold by the plaintiff; that it would give the defendant detailed information with respect to any methods developed or used by the plaintiff in decreasing the cost of manufacturing radio tubes and give the defendant a reasonable time in which to adopt such new methods; and that it would, in case any further licenses under the radio tube patents were issued to parties who

had been or were infringing the patents, rebate all royalty payments made by the defendant to the plaintiff prior to the date on which such infringing parties were granted licenses. The defendant alleged breaches by the plaintiff of all the foregoing provisions of the alleged parol agreement and consequent damage to the defendant, for which it prayed judgment on the counterclaim to an amount exceeding $300,000. As far as is shown by the record, this suit is still pending between the parties in the Supreme Court of the State of New York.

After the notice of termination of the license agreement had been given, the defendant continued to manufacture and sell tubes embodying the inventions covered by the patents. Accordingly, on May 26, 1932, apparently without any new application to the court, a writ of injunction was issued by the clerk of the District Court under the order authorizing its issuance entered over two years before, which was served on the defendant the following day. The defendant ignored service of the writ and continued to manufacture and sell tubes, whereupon the plaintiffs secured on July 7, 1932, an order to show cause why the defendant should not be punished by a fine payable to the Radio Corporation for violating the injunction. Affidavits in support of, and in opposition to, the motion to punish for contempt were filed in the District Court which, on September 28, 1932, entered the decree appealed from adjudging the defendant in contempt and imposing a fine of $500 payable to the Radio Corporation.

The same day that the decree was entered the defendant procured an order to show cause why an order should not be made vacating or modifying the injunctions issued on May 26, 1932, and declaring that the defendant might continue to manufacture and sell tubes under the license agreement. This motion was denied by the District Court in the order appealed from filed October 20, 1932.

The defendant contends that the decree adjudging it in contempt was improperly entered on two grounds. Its initial argument is that the lapse of over two years between entry of the order authorizing the injunction and its actual issuance and service, of itself prevents an adjudication of contempt for violation of the writ. The second and more fundamental contention is that, by reason of the plaintiffs' breach of the parol agreement set forth in the counterclaim in the action in the state court, there was no default in payment of royalties because the defendant's damages

exceeded the royalties due under the license agreement, and that consequently the plaintiffs could not terminate the license, which, if it remained in force, constituted a complete defense to any action for violation of the injunction.

In support of the first point, the defendant relies chiefly on McCormick v. Jerome, Fed. Cas. No. 8,721. In that case an injunction restraining infringement of a patent was ordered on April 28, 1855, and tested June 11, 1855. No writ was served for almost a year, in the course of which another federal court held that the machines which the defendants manufactured did not infringe the plaintiff's patents. McCormick v. Manny, Fed. Cas. No. 8,724. After this decision, and on June 4, 1856, a writ under the order entered over a year previously was served on the defendants, who did not observe its terms. Upon an order to show cause why a writ of attachment against the defendants should not be granted, it was held by Judge Betts that the failure to put the writ of injunction in execution before the term of court during which it had been ordered had expired rendered it necessary for the plaintiff to make a new application to the court before attempting to enforce the injunction, and that failure to make such new application barred an attachment for contempt. Similarly, in James v. Downes, 18 Ves. Jr. 522, Lord Eldon refused to commit for contempt one who had violated an order for an injunction with knowledge of its pronouncement, where no order had been drawn up or served at the time of the motion to commit three or four months after the order had been pronounced. See, also, In re Cary (D. C.) 10 F. 622, at page 628; Vansandau v. Rose, 2 Jac. & W. 264, at pp. 265, 266; Farnsworth v. Fowler, 1 Swan (Tenn.) 1, at page 5, 55 Am. Dec. 718. We do not think, however, that these decisions should be applied in the present case. It is well settled that a party is liable in contempt for disobedience of an injunction of which he has notice, even though it has not been served upon him. Ex parte Lennon, 166 U. S. 548, 17 S. Ct. 658, 41 L. Ed. 1110. The defendant is adequately protected against unconscionable delay in issuance and service of the writ, in that he can move for dissolution of the injunction for failure to execute it. Failure to serve the writ in the same term of court during which the order was entered should not bar a proceeding for contempt where the defendant has full knowledge of the order. Howe v. Willard, 40 Vt. 654. Nor do we think that the rule announced in McCormick

v. Jerome, supra, and similar cases, should be applied except where the plaintiff's failure to obtain issuance of and to serve the writ is of such a nature as to mislead the defendant and make it reasonable for him to suppose that the plaintiff does not intend to execute the order for an injunction. United Telephone Co. v. Dale, L.-R. 25 Ch. D. 778. See State v. Durein, 46 Kan. 695, 27 P. 148; Joyce on Injunctions § 267. In the present case no such circumstances appear. Apparently the plaintiffs were unwilling to grant the defendant a license unless the latter would consent to the entry of the consent decree and order for an injunction. It is clear that the reason no writ issued at the time of the order was that the plaintiffs had no occasion to enforce the order, since a license was simultaneously granted. But the license provided for its own termination, and the defendant must reasonably have known that the plaintiffs would rely on the injunction to protect its rights under the patents should the license cease to be operative. Cf. Pentlarge v. Beeston (C. C.) 1 F. 862, at pages 864, 865. Consequently we find no merit in the defendant's first contention, and conclude that mere lapse of time between entry of the order and its ultimate execution by issuance and service of the writ cannot avail the defendant if it has in fact knowingly violated the terms of the injunction.

■ The appellant's second argument amounts in substance to a contention that the injunction has not been violated, because the license remains in effect. It is clear that, had no injunction been issued, a subsisting license would have been a complete defense to an original action for infringement of the patents in question. DeForest Co. v. United States, 273 U. S. 236, 47 S. Ct. 366, 71 L. Ed. 625. It can make no difference that, in the present case, the injunction was ordered before the license was granted. As long as the license continues in force, the operation of the injunction is suspended with respect to all acts permitted by the license. A plaintiff cannot seek the imposition of a fine for contempt on account of acts forbidden by the injunction where he has acquiesced in their commission by entering into a license agreement which grants the defendant rights under the same patents upon which the injunction was based. American Pastry Products Corp. v. United Products Corp. (D. C.) 39 F.(2d) 181; Howard v. Durand, 36 Ga. 346, 91 Am. Dec. 767; cf. Mills v. Cobby, 1 Merivale 3; Courtland Wagon Co. v. Shields (Tenn. Ch. App.) 56 S. W. 278. It is **true**

that, with respect to acts forbidden by the injunction and not permitted under the license, a bill for infringement will lie, and the license will be no defense. DeForest Co. v. United States, 273 U. S. 236, at page 242, 47 S. Ct. 366, 71 L. Ed. 625; Henry v. Dick Co., 224 U. S. 1, at page 24, 32 S. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880. And proceedings for contempt will, therefore, lie for infringing acts outside the scope of a license granted after an injunction against infringement has issued. American Pastry Products Corp. v. United Products Corp. (D. C.) 39 F.(2d) 181. But in the present case there is no contention that the defendant acted outside the scope of the license, and the only possible basis for proceedings in contempt is that the license is no longer in force. Where a license has expired or been otherwise terminated, a bill for infringement will lie. Foster Hose Supporter Co. v. Taylor (C. C. A.) 184 F. 71; England v. Thompson, Fed. Cas. No. 4,487. It follows from the foregoing considerations that if, in the present case, the defendant's license was not validly revoked, the fine for contempt was improperly imposed, but that, if the license is no longer in force, the defendant is guilty of infringement in disobedience to the provisions of the injunction.

■ Before discussing the question whether the license continued in force or was terminated by the notice sent by the Radio Corporation on March 11, 1932, it is necessary to determine whether that question can properly be tried out in proceedings for contempt for violation of the injunction. In the ordinary case where the question of termination of a license arises, there is no pre-existing order of injunction, and the question is tried on an original bill for an injunction against infringement. But where, as in the present case, an injunction is already in force, the defendant is in the predicament of being liable in contempt if he cannot show that a license is in force rather than merely subject to being enjoined against infringement in futuro. Where there is a substantial dispute concerning the subsistence or termination of the license, it would not seem to be reasonable that the defendant should be put at the peril of correctly gauging his right under the license or being liable in contempt. The situation is analogous to that which exists where, after an injunction against infringement has been granted, the defendant manufactures or sells a device differing to some extent from the one which was adjudged to infringe in the injunction suit. Where the alteration in the device

is "merely colorable" and obviously was made for the purpose of evading the decree without essential change in the nature of the device, the courts will try the question of infringement by the new device in proceedings for contempt for violation of the injunction. Frank F. Smith Metal Window Hardware Co. v. Yates (C. C. A.) 244 F. 793; Gordon v. Turco-Halvah Co. (C. C. A.) 247 F. 487; Cary Mfg. Co. v. Acme Flexible Clasp Co. (C. C. A.) 108 F. 873; Schey v. Giovanna (C. C. A.) 273 F. 515; Eureka Tool Co. v. Wire Rope Appliance Co. (C. C. A.) 265 F. 673; Blair v. Jeanette-McKee Glass Works (C. C.) 161 F. 355; Burr v. Kimbark (C. C.) 29 F. 428; Queen & Co. v. Green (C. C.) 170 F. 611. But where infringement by the new device is not clear on the face of the matter, and there are substantial issues for the determination of the court, the plaintiff may not have them determined in contempt proceedings, but must bring a supplemental bill for an injunction covering the new device, or institute a wholly new suit for such an injunction. Crown Cork & Seal Co. v. American Cork Specialty Co. (C. C. A.) 211 F. 650; Charles Green Co. v. Henry P. Adams Co. (C. C. A.) 247 F. 485; Rajah Auto Supply Co. v. Grossman (C. C. A.) 207 F. 84; Enterprise Mfg. Co. of Pennsylvania v. Sargent (C. C.) 48 F. 453; Allis v. Stowell (C. C.) 15 F. 242; Bonsack Mach. Co. v. National Cigarette Co. (C. C.) 64 F. 858; General Mfg. Corp. v. Gray (D. C.) 48 F.(2d) 602; Wachsman v. Wachsman (D. C.) 46 F.(2d) 482; see California Paving Co. v. Molitor, 113 U. S. 609, at page 618, 5 S. Ct. 618, 28 L. Ed. 1106; 3 Robinson on Patents, §§ 1217, 1218. We think the defense in the present case is without substance.

The defendant submitted in opposition to the motion for contempt various affidavits including one sworn to by J. J. Steinharter, the president of the defendant corporation, in which he set forth the parol agreement relied upon in the counterclaim in the action in the state court, and gave an account of the negotiations leading up to its alleged execution. Another affidavit sworn to by Eugene L. Garey, a director of the defendant, who participated in the negotiations for the license, in many respects supports Steinharter's claims. A letter written by the Radio Corporation to the defendant on September 1, 1931, in which the former offered to reduce the royalty from 7½ per cent. to 5 per cent. and credit all royalties theretofore paid in excess of 5 per cent., if the licensee released the licensors "from any and all claims arising out of any acts or failures to act of any of the Licensors," is

thought by the defendant to support its position. But the proposed release may well have been inserted merely out of abundant caution and the reduction of royalties to 5 per cent. was in accordance with the provisions of section 7 of article 3 of the written license because other licenses had been issued at that rate (Record, p. 56). In affidavits sworn to by Schairer, a vice president of the Radio Corporation, Anderson, an employee who conducted the negotiations leading up to the license agreement, and Lambert, an attorney, it is denied that any separate parol agreement was made and that Anderson had authority to make one. The District Judge made no findings touching the issues of fact raised by these affidavits, and apparently imposed the fines on the erroneous assumption that the defendant was bound to observe the injunction even if the license had remained in effect. It seems highly improbable that the licensor would have agreed to furnish its licensee with information as to its manufacturing methods or to make the prices for its tubes dependent on what might be the saving to a licensee who adopted such methods. It seems equally improbable that the licensor would have left to an oral arrangement, an agreement to rebate all prior royalty payments whenever future licenses might be granted to persons who had been infringing the patents. It also seems highly improbable that Anderson, the employee of the licensor, who is charged with making these parol agreements, should have been empowered to enter into important engagements by word of mouth when the license proper was carefully executed by officers of the companies. Anderson was not an officer and his authority to close license agreements is specifically denied.

But even if the alleged agreement was entered into, it is argued that the defendant cannot rely upon it, for the reason that both the parol evidence rule and the statute of frauds prevent its being established.

█ The applicability of the parol evidence rule depends on whether the written license was intended to cover the subject of negotiation between the parties—in this case all the terms of the license. Wigmore on Evidence (2d Ed.) § 2430. As to this, the defendant can argue that its president, Steinharter, has filed an affidavit to the effect that at the time of the negotiations he asked to have the terms of the parol agreement incorporated in the written license and the licensor declined saying that it had other licenses outstanding similar in form to the one offered in writing and had committed itself to the holders of those

784

licenses as to the form of licenses it would thereafter issue, but adding that it would, nevertheless, comply with all the provisions of the contemporaneous parol agreement. The matters dealt with in the alleged parol agreement are so closely identified with those in the formal license that there ordinarily could be no doubt that the formal document was intended to cover all the subjects of the negotiations. Seitz v. Brewers' Refrigerating Co., 141 U. S. at page 517, 12 S. Ct. 46, 35 L. Ed. 837. But it may be that the affidavit of Steinharter that the oral agreement was not incorporated because of a special reason is sufficient to show that the formal license was not intended to embody the agreement of the parties and to render the parol evidence rule inapplicable. While the likelihood of such a separate agreement, or the authority to make it, may be slight, it may be that in the special circumstances proof of it should not be excluded under the parol evidence rule.

■■■■ The statute of frauds, however, seems to be a complete bar to proof of the oral agreement. Defendant claims that by this agreement the Radio Corporation was bound (a) to furnish it with advance notice of changes in price and tubes, (b) to change prices in tubes in accordance with defendant's costs, (c) to treat all licensees alike, (d) to rebate defendant's royalties on granting future licenses. To give these provisions the meaning that is sought and to incorporate them in the agreement as a whole, they must be regarded as for four years—the term of the license—and subject to the right of the Radio Corporation to terminate for defaults. The New York statute of frauds renders every agreement void unless it be in writing if such agreement "by its terms is not to be performed within one year from the making thereof" (New York Personal Property Law (Consol. Laws, c. 41) § 31). It is said that this statute is not applicable because the parol agreement might be performed within a year owing to the fact that the license agreement contains an option to terminate it in the event of a default. But the agreement, according to its terms, was to be performed for a period of four years and hence falls directly within the statute. As Justice Gray said in Warner v. Texas & Pacific Railway, 164 U. S. at page 434, 17 S. Ct. 147, 153, 41 L. Ed. 495: "The question is not what the probable, or expected, or actual performance of the contract was, but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year." American Merchant Marine Ins. Co. v. Letton (C. C. A.) 9 F. (2d) at page 802; Harper Trans. Co. v. Johnson & Higgins (C. C. A.) 244 F. 936; Allwin Realty Co. v. Barth, 161 App. Div. 568, 146 N. Y. S. 960; Buhl v. Stephens (C. C.) 84 F. at page 925; Hill v. Hooper, 1 Gray (Mass.) 131.

■■■■ The defendant relies on the decision of the New York Court of Appeals construing this statute in Blake v. Voigt, 134 N. Y. 69, 31 N. E. 256, 30 Am. St. Rep. 622. There an absolute option to terminate a contract within a year was held to take it out of the statute of frauds. In Standard Bitulithic Co. v. Curran, 256 F. 68, this court held (Judge Hough dissenting) that an option to terminate an oral contract of employment for nine and a half years if the services of the plaintiff were unsatisfactory, or if the position was unsatisfactory to the plaintiff, rendered the statute inapplicable. The New York rule as to the effect of even an absolute option to cancel an oral contract which must be performed during a period greater than a year differs from the law of England and that of most of the states of the Union. Hanau v. Ehrlich, [1912] A. C. 39; Birch v. Earl of Liverpool, 9 B. & C. 392; Dobson v. Collis, 1 H. & N. 81; Harris v. Porter, 2 Har. (Del.) 27; Wilson v. Ray, 13 Ind. 1; Bernier v. Cabot Manufacturing Co., 71 Me. 506, 36 Am. Rep. 343; Biest v. Versteeg Shoe Co., 97 Mo. App. 137, 70 S. W. 1081; Wagniere v. Dunnell, 29 R. I. 580, 73 A. 509, 17 Ann. Cas. 205.

But an option to terminate for no reason at all, or because of mere dissatisfaction differs from one that, as here, can only be exercised in case of a breach, or of bankruptcy, insolvency, or the appointment of a receiver. Such options as were dealt with in Blake v. Voigt and Standard Bitulithic Co. v. Curran may easily be said to render the contract one that "according to the reasonable interpretation of its terms" did not require that "it should be performed within the year," for they could be invoked at the mere wish of the party, or whenever he was dissatisfied with performance. There was an option of the first kind in Seddon v. Rosenbaum, 85 Va. 928, 9 S. E. 326, 3 L. R. A. 337. But the option in the present case could be exercised only in the event of a breach by the licensee, or its bankruptcy, or insolvency, or upon the appointment of a receiver—contingencies over which the licensor had no control. The existence of such an option does not take the case out of the statute of frauds for the contingency upon which its exercise depends is one which the licensor cannot hasten or re-

tard. The required performance was for four years, which would be the normal term and the actual one, but for the default of the licensee, over which the licensor had no control. Washington, A. & G. Steam Packet Company v. Sickles, 5 Wall. at page 595, 18 L. Ed. 550; Wahl v. Barnum, 116 N. Y. 87, 22 N. E. 280, 5 L. R. A. 623; McGirr v. Campbell, 71 App. Div. 83, 75 N. Y. S. 571; Drummond v. Burrell, 13 Wend. (N. Y.) 307; Tolley v. Greene, 2 Sandf. Ch. (N. Y.) 91; Hill v. Hooper, 1 Gray (Mass.) 131; Gottschalk v. Witter, 25 Ohio St. 76. As well might the possibility of a breach so fundamental that the plaintiffs might rescind take an oral contract out of the statute, as an option to terminate that is exercisable only in the event of a breach or of insolvency.

The defendant sets up the claim that when the oral contract was made the plaintiffs had a present intention of not performing it and says that intention was a fraud which would enable a court of equity to reform the agreement and compel its reduction to writing and prevent the plaintiffs from invoking the statute of fraud.

Even if it be assumed that the alleged oral agreement was authorized and made, we see nothing in the record to support the claim that there was an initial purpose not to perform it beyond the bare assertion of the defendant in its answer in the state court action.

Moreover, there was in this case no promise to reduce the parol agreement to writing, as in McBurney v. Wellman, 42 Barb. (N. Y.) 390, but, according to the defendant's own proof, a refusal to do this very thing. The parol contract was not one relating to real property where part performance sometimes prevents the defense of the statute of frauds. The licensee was seriously in default in payment of royalties long before any right to a rebate of royalties arose even under its own claim, and if there were any showing that it was defrauded by a promise which the licensor intended not to keep, it had an adequate remedy at law for damages and a right to sue in equity for a rescission of the original settlement (Adams v. Gillig, 199 N. Y. 314, 92 N. E. 670, 32 L. R. A. (N. S.) 127, 20 Ann. Cas. 910) without resorting to novel theories of equitable estoppel in order to avoid the statute of frauds. It is well settled that oral contracts that are not to be performed within a year are not taken out of the statute by part performance except in certain cases in which real estate is involved or in which specific performance would be decreed. Oddy v. James,

48 N. Y. 685; McGirr v. Campbell, 71 App. Div. at page 86, 75 N. Y. S. 571; Drummond v. Burrell, 13 Wend. (N. Y.) 307; Britain v. Rossiter, 11 Q. B. D. 123; Treadway v. Smith, 56 Ala. 345; Osborne v. Kimball, 41 Kan. 187, 21 P. 163; Baldridge v. Centgraf, 82 Kan. 240, 108 P. 83; Emery v. Smith, 46 N. H. 151. The present situation seems just the sort of one the statute was intended to cover.

We think the licensee's defense unsubstantial because (1) the alleged parol agreement was inherently improbable, (2) because its authorization by the Radio Corporation was insufficiently shown, and (3) because it could not be proved owing to the statute of frauds.

The decree and orders appealed from are each affirmed.